STATE of Minnesota, Respondent,

v.

William Charles GOODRICH, Appellant.

No. 46101.

Supreme Court of Minnesota.

July 15, 1977.

C. Paul Jones, Public Defender, Jeanne L. Schleh, and Robert J. McNulty, Jr., Asst. Public Defenders, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Richard G. Mark, Asst. Atty. Gen., Frederick S. Suhler, Jr., Sp. Asst. Atty. Gen., St. Paul, Randolph T. Brown, County Atty., Long Prairie, for respondent.

Heard before ROGOSHESKE, PETERSON, and MacLAUGHLIN, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

On the basis of evidence obtained during an "inventory" of defendant's automobile, which had been impounded when defendant was arrested for "driving under the influence," Minn.St. 169.121, subd. 1(a), defendant, William C. Goodrich, was found guilty of two counts of possession of controlled substances, Minn.St. 152.09, subd. 1(2). On appeal, defendant asserts that the evidence was inadmissible, being the fruit of an unconstitutional search. We hold that where police assumed custody of defendant's automobile for no legitimate state purpose other than safekeeping, and where defendant had arranged for alternative means, not shown to be unreasonable, for the safeguarding of his property, impoundment of defendant's automobile was unreasonable and, therefore, the concomitant inventory was an unreasonable search under the Fourth Amendment. We accordingly reverse.

While on duty the evening of Friday, August 30, 1974, Officer Dwaine Winter of the Staples Police Department received from the police dispatcher two complaints of erratic driving. Responding to these complaints, the officer followed an automobile being driven by defendant. After about a block and a half, during which time the officer noticed nothing wrong with defendant's driving, defendant drove his automobile off the road and into a gasoline service station. The officer followed,

parked his vehicle, got out, and approached defendant to tell him about the complaints. The officer testified that defendant appeared "disheveled, mussed up, blear[y]-eyed." His eyes were "blood shot, watery, pupils were large, dilated," his speech was "not normal," and he moved in a staggered, uncoordinated way. In contrast, five other witnesses testified that defendant's appearance was not unusual, nor did he appear to be under the influence of alcohol or drugs.

After confronting defendant, Officer Winter arrested him for "driving under the influence," Minn.St. 169.121, subd. 1(a). He proceeded to search through defendant's automobile over defendant's objections that he had no right to do so. The officer asked defendant to open the locked glove compartment, but defendant, who retained possession of the keys, refused.

During this period, a computer check revealed that the automobile was not registered to defendant. Officer Winter testified that he questioned defendant about this and that defendant responded that he had recently purchased the automobile. Defendant testified that he was never asked about ownership of the automobile.

Upon defendant's request, Officer Winter permitted him to cross the street to make a telephone call while the officer remained at the service station. Finding the telephone occupied, defendant returned to the service station and, from there, called his brother. Soon after, defendant's brother and mother arrived. Defendant testified that he called his brother because the officer had indicated that he was going to impound the automobile and defendant hoped to avoid the towing and storage fees by arranging for his family to take the automobile home. Staples is a small town and Officer Winter knew defendant and his family. Defendant's brother asked Officer Winter if he could take the automobile. The officer, who had already called the garage owner under contract with the city to tow vehicles, refused the brother's request.

Defendant's automobile was towed to the impoundment lot and placed in a locked garage. Defendant was taken to the police station and then to the hospital, after he consented to the administration of tests for alcohol and drug consumption. After the tests, defendant was taken to jail. The tests subsequently showed negative results.

Officer Winter had been on duty alone and did not have time to inventory the automobile before impounding it. The following morning, the owner of the garage in which the automobile was parked notified Officer Winter that he wished to remove it from the garage to make room for his own vehicle. Officer Winter arranged for Chief Henry Michael Carr of the Staples Police Department to meet him at the garage to inventory the contents of the automobile.

The two police officers searched the automobile thoroughly. On the floor of the automobile, under some candy wrappers, they found a white tablet. Although the glove compartment was described as "locked," Chief Carr stated that he put his fingers on it and "it popped open." In the glove compartment the officers found some more white tablets, which proved to be amphetamines, and a small quantity of LSD.

Officer Winter testified that his practice is to impound a vehicle whenever the vehicle is in a public place and the driver is taken into custody. His reason is that:

" * * * [Y]ou are responsible when you are taking a man in custody, for his car or whatever he might have with him; you are responsible to see that is properly taken care of. You don't leave it on the street. You are responsible for any valuables or anything in his personal possession."

An impounded vehicle is taken to either of two places: If the driver will allow a police officer to drive the vehicle, the vehicle is driven to the police station parking lot, locked, and left there; otherwise, the vehicle is towed to a privately owned lot pursuant to a contract between the city and the owner of the lot. In either event, an inventory is taken. When first asked, Winter explained that he impounded defendant's automobile because defendant would not allow anyone to drive it to the police station parking lot.

Chief Carr testified that the impoundment policy of the Staples Police Department is that an officer impounds a vehicle if and when, in that officer's discretion, impoundment is necessary. The department had issued no written regulations, but Chief Carr said the described policy had been in effect during the 4 years of his tenure with the department. He described the purpose of impoundment as "[m]ostly for security and safety purposes."

At the conclusion of the Rasmussen hearing, the trial court made oral findings and held the evidence admissible. It found that the impoundment and inventory were "the usual procedure" in the city of Staples and that it was reasonable for the officers to have conducted the inventory when they did. The court then stated:

" * * * I think this need to impound in that sense is discretionary with the officer. There is argument that both the defendant's brother and mother were responsible persons. That very likely is true. There has been no evidence at this hearing to indicate that however, or more importantly to indicate that the officer knew that at the time.

"There is also the question of the ownership of the car, and I think the officer would have some problems justifying his actions if he had turned the car over to even a relative if it turned out not to be a responsible person.

> *    *    *    *    *    *

"I might add to the comments I previously made that there was no evidence on the part of the officer that at the time the defendant's brother and mother appeared at the filling station that they were intoxicated or otherwise incompetent to drive an automobile; it doesn't appear the officer made any inquiry; the fact they appeared there by automobile would give some indication that at least one of them was a licensed driver, although there is no specific evidence on the matter, and as I said it does not appear the officer made any such inquiry, in fact I think the testimony from their request to take the car his answer was

'no.' I could add to that, it appears that whether or not the defendant's mother or brother were licensed drivers is not a factor in the officer's determination not to release the car to them since he made no inquiry."

Defendant argues that the evidence is inadmissible because (1) the "investigatory stop" of defendant was unconstitutional, rendering illegal the arrest and the impoundment and inventory conducted pursuant to that arrest; (2) the search of defendant's automobile violated his Fourth Amendment rights where reasonable alternatives to impoundment existed. We find the latter argument determinative and do not reach defendant's alternative issue that the "inventory" was merely a pretext for an investigatory search.

The United States Supreme Court, in the case of *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), recently considered the reasonableness of warrantless, nonconsensual, automobile "inventory" searches. Because the state had conceded the applicability of the Fourth Amendment, a majority of the court did not reach the issue of whether automobile inventories are searches within the meaning of the Fourth Amendment. The supreme court held that inventories of automobiles impounded or otherwise in lawful police custody are reasonable when conducted pursuant to standard police procedures "aimed at securing or protecting the car and its contents." 428 U.S. 373, 96 S.Ct. 3098, 49 L.Ed.2d 1007.

In *Opperman*, defendant's unoccupied automobile was impounded after it was ticketed twice for over-time parking violations while parked overnight in a restricted zone. It was noted that "[t]he owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings." 428 U.S. 375, 96 S.Ct. 3099, 49 L.Ed.2d 1009. There was no dispute as to the propriety of the act of impoundment itself. The case thus leaves open the issue presented here: Whether impoundment

was reasonable after defendant had made other arrangements for disposition of the automobile.

We had previously held, in *City of St. Paul v. Myles*, 298 Minn. 298, 300, 218 N.W.2d 697, 698 (1974), that under the facts and circumstances of that case, an inventory conducted pursuant to a standard police procedure prior to lawfully impounding an automobile was not unconstitutional under the Fourth Amendment. In *Myles* we considered the threshold propriety of the impoundment: "In the instant case it was appropriate that the police impound the car and have it towed off the street. The owner of the car was not present, and the driver and passengers were under arrest. It was 1:35 a. m. Under all of the circumstances, it was a reasonable measure to protect the car and its contents."

In the supreme court cases cited in the *Opperman* opinion, similar observations are made with respect to the absence of the owner or driver. In *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), an off-duty Chicago policeman was involved in an automobile accident in Wisconsin. The local police, believing that Chicago policemen were required to carry their service revolvers in their possession at all times, searched the officer's vehicle, finding in the trunk evidence upon which the officer was subsequently convicted for murder. The United States Supreme Court upheld the search and affirmed the admissibility of the inadvertently discovered evidence. In support of its conclusion, the court noted that the police, for reasons of safety, had legitimately exercised a form of control over the vehicle since it was disabled and constituted a nuisance on the public highway; and since the officer, being intoxicated and later comatose, "could not make arrangements to have the vehicle towed and stored." 413 U.S. 443, 93 S.Ct. 2529, 37 L.Ed.2d 715. In *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), the automobile was impounded pursuant to a California statute which authorized the police to hold for evidence, until forfeiture was declared or a release ordered, any vehicle used in illegal drug trafficking. The

court held it would be unreasonable to hold that "the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it." 386 U.S. 61, 87 S.Ct. 791, 17 L.Ed.2d 733.

As we stated in *City of St. Paul v. Myles, supra*, the police will generally be able to justify an inventory, taken to safeguard the contents of the automobile, once the police have lawful custody of the vehicle. In determining whether an inventory search is reasonable, we must therefore look, as a threshold inquiry, to the propriety of the impoundment, since the act of impoundment gives rise to the need for and justification of the inventory. If impoundment is not necessary, then the concomitant search is unreasonable. Accord, *State v. Boster*, 217 Kan. 618, 539 P.2d 294 (1975); *Altman v. State*, 335 So.2d 626 (Fla.App. 1976); *State v. Bales*, 15 Wash.App. 834, 552 P.2d 688 (1976). The state's interest in impounding must outweigh the individual's Fourth Amendment right to be free of unreasonable searches and seizures; although the expectation of privacy with respect to an automobile is significantly less than the traditional expectation of privacy associated with the home, this interest is still constitutionally protected, *South Dakota v. Opperman, supra*.

Counsel for the state proffered various arguments in support of the officer's decision to impound defendant's automobile. At oral argument, the state pressed only two: (1) That the automobile was not registered to defendant; and (2) that the police officer believed defendant's mental condition to be such that he was incapable of making an intelligent decision with respect to custody of the automobile. The latter argument was raised for the first time at oral argument. The officer himself during the preliminary and Rasmussen hearings never assigned this as a reason for the impoundment. Furthermore, the officer's conduct belied any such concern for defendant's mental condition. He allowed defendant to cross the street, unaccompanied, to place a telephone call.

The registration argument is also unpersuasive. The mere fact that the automobile was not registered to defendant, in the absence of reason to believe that defendant was wrongfully in possession of it, does not render impoundment reasonable upon defendant's unrelated arrest for "driving under the influence," and despite defendant's alternative arrangements for disposition of the automobile. The officer did not believe that the automobile was stolen. At most, he testified that he did not know it was *not* stolen and that it was possibly a stolen car which had not yet been reported. Counsel for the state upon oral argument acknowledged that:

> "I don't think it behooves me to come up here and say the officer felt the car was stolen. I think that would be an outlandish position."

Furthermore, the registration argument was a belated explanation not raised at the preliminary hearing nor at the Rasmussen hearing until the state's rebuttal, and after Chief Carr's testimony that impoundment was effected upon an officer's discretionary determination of necessity. Officer Winter up until that time had said that he always impounded the vehicle of an arrested driver when the vehicle was in a public place. When asked why he impounded defendant's automobile, he responded that defendant would not allow anyone else to drive it, as if the only two alternatives upon arrest of a driver were to tow the automobile to the privately owned lot or have it driven to the police station parking lot. Officer Winter did not act as if the question of ownership

motivated his conduct in impounding the automobile. In addition, there is no evidence that the discrepancy in registration was ever mentioned as a reason for impoundment at the time or that the officers further investigated the issue.

The sole remaining reason given in this case for impoundment and inventory, the reason repeatedly espoused by Chief Carr and Officer Winter, is the necessity of protecting the arrested individual's property from theft and the police from claims arising therefrom. But the defendant's assumption of responsibility for his property obviated that necessity in this case. Defendant did not ask to simply leave his locked automobile on the street (see, *St. Paul v. Myles*, 298 Minn. 298, 300, 218 N.W.2d 697, 698) but arranged to have his mother or brother drive it home. The gratuitous assumption of custody by the police on the facts of this case gave rise to an invasion of defendant's privacy protected by the Fourth Amendment.

The state has not shown that the impoundment was a reasonable means of furthering a reasonable state purpose. We hold, therefore, that the search incident to the impoundment violated defendant's Fourth Amendment rights, and the evidence obtained thereby is inadmissible.

■ In reaching the merits, we have rejected the state's argument that defendant's appeal is moot because of his discharge from probation without adjudication of guilt. After finding defendant guilty, the trial court, by authority of Minn.St. 152.18,[1] deferred imposition of sentence

---

**1.** Minn.St. 152.18 provides: "Subdivision 1. If any person is found guilty of a violation of section 152.09, subdivision 1, clause (2) [possession of a controlled substance] after trial or upon a plea of guilty, the court may, without entering a judgment of guilt and with the consent of such person, defer further proceedings and place him on probation upon such reasonable conditions as it may require and for a period, not to exceed the maximum term of imprisonment provided for such violation. The court may give the person the opportunity to attend and participate in an appropriate program of education regarding the nature and effects of alcohol and drug abuse as a stipulation of probation. Upon violation of a condi-

tion of the probation, the court may enter an adjudication of guilt and proceed as otherwise provided. The court may, in its discretion, dismiss the proceedings against such person and discharge him from probation before the expiration of the maximum period prescribed for such person's probation. If during the period of his probation such person does not violate any of the conditions of the probation, then upon expiration of such period the court shall discharge such person and dismiss the proceedings against him. Discharge and dismissal hereunder shall be without court adjudication of guilt, but a nonpublic record thereof shall be retained by the department of public safety solely for the purpose of use by the courts in

and, without entering a judgment of guilty, placed defendant on probation for 3 years. Defendant filed notice of appeal. Pending appeal, he complied with the conditions of his probation, and the proceedings against him were dismissed.

In *State ex rel. Djonne v. Schoen*, 299 Minn. 131, 133, 217 N.W.2d 508, 510 (1974), we articulated the stringent standard for finding issues raised in a criminal appeal to be moot. "Where there remains a 'possibility' that 'adverse collateral legal consequences' will inure to the complaining party, the case is not moot." We quoted with approval the following language from *Hewett v. North Carolina*, 415 F.2d 1316, 1322 (4 Cir. 1969):

> "Petitioners argue additionally, and we agree, that in the event either of them has future difficulties with the law the sentencing judge would have broad discretion to take into account the prior criminal record of the accused. * * * Any judge who might be called upon to consider probation or sentence for future offenses for either of petitioners would be bound to be influenced by that petitioner's prior probationary experience."

Minn.St. 152.18, subd. 1, provides that "a nonpublic record [of the discharge and dismissal] shall be retained by the department of public safety solely *for the purpose of use by the courts in determining the merits of subsequent proceedings against such person.*" (Italics supplied.) The statute contemplates use of the record should defendant have "future difficulties with the law."

---

determining the merits of subsequent proceedings against such person. The court shall forward a record of any discharge and dismissal hereunder to the department of public safety who shall make and maintain the nonpublic record thereof as hereinbefore provided. Such discharge or dismissal shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose.

"Subd. 2. Upon the dismissal of such person and discharge of the proceedings against him pursuant to subdivision 1, such person may apply to the district court in which the ·trial was had for an order to expunge from all official records, other than the nonpublic record retained by the department of public safety pursuant to subdivision 1, all recordation relat-

We accordingly find a sufficient "possibility" of "adverse collateral legal consequences" to hold that this appeal is not moot.

Reversed.

ing to arrest, indictment or information, trial and dismissal and discharge pursuant to subdivision 1. If the court determines, after hearing, that such person was discharged and the proceedings against him dismissed, it shall enter such order. The effect of the order shall be to restore the person in contemplation of the law, to the status he occupied before such arrest or indictment or information. No person as to whom such an order has been entered shall be held thereafter under any provision of any law to be guilty of perjury or otherwise giving a false statement by reason of his failure to recite or acknowledge such arrest, or indictment or information, or trial in response to any inquiry made for him for any purpose."