### STATE of Vermont v. Zachary M. LIZEE

[783 A.2d 445]

No. 00-445

September 26, 2001. The State appeals from a decision of the district court granting defendant's motion to suppress evidence obtained from a search of his impounded vehicle. The State contends that the court erred in failing to uphold the seizure and subsequent search of the vehicle under the "community caretaking" doctrine. We affirm.

As found by the trial court, the facts were as follows: On the evening of December 10, 1999, a police officer with the Winhall Police Department stopped defendant's vehicle for having a non-functioning rear plate light. The stop occurred in a rural area. Although defendant's vehicle was pulled as far onto the shoulder as possible, part of the vehicle remained in the traveled portion of the

road. The officer parked his cruiser behind defendant's car, approached the vehicle, and encountered defendant and another person sitting in the passenger seat. The officer informed defendant of the reason for the stop and asked for his registration, license, and insurance material. Defendant presented his license and an expired insurance card, and failed to produce a registration. The officer asked defendant to accompany him to his cruiser, where a DMV check revealed that the registration had expired and there was a pending suspension for lack of insurance, although it had not gone into effect. Despite the DMV information, defendant's vehicle had valid registration stickers on the license plates; defendant explained that he had personally registered the vehicle within the last two days. He also told the officer that he had recently failed to pay his insurance premium for lack of funds.

The officer indicated that he planned to issue defendant a warning for the plate-light violation, and citations for the insurance and registration violations. The officer then returned to defendant's car and questioned the passenger. Believing that he detected the odor of marijuana, the officer asked the passenger whether he was in possession of marijuana, which the passenger denied. The officer then returned to the cruiser, asked defendant if there was marijuana in the vehicle — which defendant also denied — and requested consent to search the vehicle. Defendant refused to give consent, stating that there was nothing to find and that he was in a hurry to leave. Undeterred, the officer pressed defendant, asking if a canine would react to a search of the vehicle. Defendant again insisted that there was nothing in the vehicle, and requested permission to leave. The officer told him to wait, and radioed in to inquire about obtaining a canine search. Learning that there was no canine within an hour of their location, the officer again asked for permission to search the vehi-

cle, and again was denied. He then had defendant and the passenger empty their pockets, which revealed nothing illegal, and informed them that they were being "detained," not arrested. The passenger was eventually handcuffed and searched, again revealing nothing illegal. By this time, a backup unit had arrived, and both officers peered closely into defendant's vehicle with flashlights. The investigating officer also unsuccessfully tried calling an 800 number for defendant's insurance company.

Failing to obtain consent to search, the officer then informed defendant that he could not drive the vehicle away without proof of insurance, and that it would have to be towed. The issue of towing the vehicle due to the insurance issue had not come up at all during the prior portion of the stop and processing. The officer called a local operator, Stuart Coleman, who often towed for the police. Coleman appeared with his tow truck, informed defendant that he was tired and would not tow the vehicle any distance, but indicated that he could tow it to his garage and defendant could call for a ride. This ultimately occurred. The officer informed defendant that he would have to show a police officer proof of insurance before his vehicle would be released to him. Coleman kept defendant's keys. Defendant and his passenger were driven to a telephone to call friends for a ride. Later that evening, the same officer stopped another vehicle for lack of a valid inspection sticker. Defendant was a passenger in that vehicle. After dealing with the violation, the officer allowed the vehicle to proceed.

The following morning, the officer returned to Coleman's garage with a state police canine unit. The police dog alerted to the trunk of defendant's car, a search warrant was obtained, and the ensuing search revealed three pounds of marijuana in the trunk. Defendant later moved to suppress the evidence, claiming that the police lacked a reasonable basis

to take custody of the vehicle, and the ensuing search was therefore unlawful. Following a hearing, the court granted the motion, finding that there was no consistent police policy or practice governing impoundment of vehicles for civil traffic violations such as a failure to provide proof of insurance, and that the decision to impound in this case was arbitrary and unsupported by the attendant circumstances. This appeal followed.

On appeal, the State contends that the warrantless search was justified as incident to the impoundment of defendant's vehicle under the so-called "community caretaking" doctrine. In *State v. Marcello*, 157 Vt. 657, 658, 599 A.2d 357, 358 (1991) (mem.), we recognized that in some circumstances the police may be justified in intruding upon a person's privacy — even absent reasonable suspicion of criminal activity — "to carry out 'community caretaking' functions to enhance public safety." *Marcello* cited the United States Supreme Court decision in *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), where the high court upheld an inventory search of a vehicle under circumstances in which the vehicle was disabled and constituted a nuisance on the highway, and the driver was intoxicated and later comatose. Subsequent high court decisions have upheld inventory searches where a car was "lawfully impounded" after multiple violations of a parking ordinance and the driver was not present to move it, *South Dakota v. Opperman*, 428 U.S. 364, 365 (1976), and where a driver had been arrested and taken into custody for driving under the influence. See *Colorado v. Bertine*, 479 U.S. 367, 368-69 (1987). In these cases, the high court expressed general approval of the practice of impounding vehicles under the caretaking function in circumstances such as accidents, DUI arrests, and violations of parking ordinances jeopardizing "the public safety and the efficient movement of vehicular traffic," *Opperman*, 428 U.S. at 368-69, where "there was no showing

that the police . . . acted in bad faith or for the sole purpose of investigation." *Bertine*, 479 U.S. at 372.

State court decisions have applied similar standards, generally requiring a showing that, "under all the attendant circumstances, impoundment is reasonably necessary." *State v. Lunsford*, 655 S.W.2d 921, 923 (Tenn. 1983); see also *State v. Goodrich*, 256 N.W.2d 506, 510 (Minn. 1977) ("The state's interest in impounding must outweigh the individual's Fourth Amendment right to be free of unreasonable searches and seizures . . . ."); *State v. Slockbower*, 397 A.2d 1050, 1055 (N.J. 1979) (impoundment of vehicle must be justified by "substantial necessities grounded in the public safety"). In determining whether impoundment was necessary, courts have focused on whether reasonable alternatives were available, such as whether "the vehicle can be parked and locked without obstructing traffic or endangering the public," *Drinkard v. State*, 584 S.W.2d 650, 653 (Tenn. 1979), whether the driver could make alternative arrangements to have the vehicle moved, see, e.g., *Goodrich*, 256 N.W.2d at 511 (ruling that State's argument for impoundment was undermined by evidence that defendant had arranged to have his mother and brother drive vehicle home), and whether the owner was under arrest or otherwise incapable of driving the vehicle. See, e.g., *City of St. Paul v. Myles*, 218 N.W.2d 697 (Minn. 1974) (upholding impoundment of car and subsequent search where owner was not present, and driver and passengers were under arrest). Yet another consideration is whether the circumstances suggest that the impoundment was "pretextual" and effected primarily for investigative rather than public safety purposes. See *Slockbower*, 397 A.2d at 1056.[1]

---

[1] Recently, in *State v. Mountford*, 171 Vt. 487, 491, 769 A.2d 639, 645 (2000), we

In several cases closely on point, courts have invalidated impoundments based on civil traffic violations. In *Goodrich*, for example, the court rejected the State's claim that impoundment was justified by a registration discrepancy, observing that it "does not render impoundment reasonable," particularly where the officer did not believe that the car was stolen, and the driver had made alternative arrangements for disposition of the vehicle. 256 N.W.2d at 511. In *Slockbower*, the New Jersey Supreme Court invalidated an impoundment based on the defendant's driving without a valid license, where the circumstances otherwise indicated that the car was not disabled and could have been safely locked and parked at the scene and arranged to be picked up by the owner later. And in *Howe v. State*, 39 S.W.3d 467 (Ark. Ct. App. 2001), the court overturned the search of a vehicle which the police had impounded based, in part, upon the driver's failure to produce valid proof of insurance. The court noted that a state statute authorized the police to

---

observed that "[t]he distinguishing feature of community caretaking and emergency assistance searches is that they are generated from a desire to aid victims rather than investigate criminals." We went on to adopt a three-part test to determine the validity of a search effected pursuant to the emergency assistance doctrine: (1) there must be reasonable grounds to believe that there is an emergency at hand and an immediate need for assistance; (2) the search must not be primarily motivated by an intent to arrest and search for evidence; and (3) there must be a reasonable nexus between the emergency and the area to be searched. Although adopted in the "emergency assistance" context, similar requirements — as the cases discussed above demonstrate — are also reflected in decisions dealing with the analogous community-caretaking exception.

impound the license plate of an operator without insurance, and to issue a temporary sticker, but that no authority reasonably supported impoundment of the vehicle itself. See *id.* at 471-72.

Viewed in light of these authorities, the trial court's ruling here was sound. As the court found, and the State does not dispute, defendant's vehicle was effectively impounded by the State notwithstanding the fact that it was towed to a private service station, as it was made clear that police approval was required for release of the vehicle. Defendant was not under arrest or otherwise unable or unavailable to drive, and the vehicle was not disabled. Defendant's offense — failure to provide proof of insurance — represented merely a civil traffic violation, not a crime, see 23 V.S.A. § 2302(b), and posed no real danger to either defendant or to the public safety. Finally, the officer's sustained detention of defendant, repeated efforts to obtain consent to search, and inconsistent conduct later that evening in declining to impound another vehicle lacking a valid inspection sticker — a patently more realistic threat to public safety — raised real concerns about the actual purpose of the impoundment in this case. We thus agree with the trial court's conclusion that the police impoundment of defendant's vehicle was unreasonable, and required suppression of the evidence obtained from the resulting search. See *Lunsford*, 655 S.W.2d at 924 (where impoundment of vehicle was held to be wrongful, subsequent inventory search was without legal justification and compelled suppression of resulting evidence).[2]

*Affirmed.*

---

[2] In view of our holding, we need not address defendant's alternative claims that impoundment of the vehicle violated his due process rights, and that the search violated his right to privacy.