COMMONWEALTH vs. GERALD EDDINGTON
(and six companion cases).[1]

Hampden. November 2, 2010. - March 10, 2011.

Present: IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Search and Seizure,* Motor vehicle, Inventory, Impoundment of vehicle. *Constitutional Law,* Search and seizure. *Motor Vehicle,* Firearms. *Firearms.*

Statement that in a criminal case involving multiple defendants (whether consolidated or not), each defendant who seeks further appellate review must file a timely application in order for this court to consider that defendant's arguments. [107]

A Superior Court judge erred in allowing the criminal defendant's motion to suppress evidence of a firearm and ammunition recovered by police officers during an inventory search of an automobile driven by the defendant, and in which a codefendant was a passenger, where, in the circumstances of the case, and taking into account the interests protected by conducting an inventory search, the police acted reasonably in deciding to impound the vehicle, given that the owner of the automobile was not present at the scene to express a preference on the disposition of the vehicle, which was parked along the curb of a public street; the early morning hour provided a sound reason for the officers' not attempting to contact the owner; the defendant was unable to operate the automobile because he had been placed under arrest; the codefendant had been drinking and was not known to be authorized to drive the automobile; and the vehicle's registration was not produced. [108-111] GANTS, J., concurring.

INDICTMENTS found and returned in the Superior Court Department on June 6, 2007.

A pretrial motion to suppress evidence was heard by *C. Brian McDonald,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Cordy,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court. After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Adriana Contartese* for Gerald Eddington.

*Thomas F. McGuire* for Jessica Cappas.

[1]Three against Gerald Eddington and three against Jessica Cappas.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

*Dana Alan Curhan,* for Committee for Public Counsel Services, amicus curiae, submitted a brief.

IRELAND, J. The defendants, Gerald Eddington and Jessica Cappas, were indicted on multiple firearm offenses,[2] and Eddington also was indicted on a charge of operating a motor vehicle with a suspended license, in violation of G. L. c. 90, § 23. After an evidentiary hearing, a Superior Court judge allowed Eddington's motion to suppress[3] the firearm and ammunition recovered by police during an inventory search of an automobile driven by Eddington, in which Cappas was a passenger, on the ground that the firearm and ammunition were obtained as a result of an unlawful impoundment.[4],[5] A single justice of this court granted the Commonwealth leave to pursue interlocutory appeals from the judge's orders, see note 5, *supra,* in the Appeals Court, see Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). The Appeals Court reversed the orders of suppression. *Commonwealth* v. *Eddington,* 76 Mass. App. Ct. 173, 179 (2010). We granted Eddington's application for further appellate review.

---

[2]Gerald Eddington was indicted on one charge of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*a*), after having been convicted previously of one violent crime and two serious drug offenses, G. L. c. 269, § 10G (*c*); one charge of unlawful possession of ammunition without a firearm identification card, in violation of G. L. c. 269, § 10 (*h*), after having been convicted previously of one violent crime and two serious drug offenses, G. L. c. 269, § 10G (*c*); one charge of unlawful possession of a loaded firearm, in violation of G. L. c. 269, § 10 (*n*). Jessica Cappas was indicted on one charge of unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*a*); one charge of unlawful possession of ammunition without a firearm identification card, in violation of G. L. c. 269, § 10 (*h*); and one charge of unlawful possession of a loaded firearm, in violation of G. L. c. 269, § 10 (*n*).

[3]In his motion to suppress, Eddington claimed that his rights under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights were violated. He did not argue that art. 14 affords him any greater protection than the Fourth Amendment.

[4]The judge denied Eddington's motion to suppress insofar as it pertained to the suppression of the open bottles of beer. We have not been asked to review the propriety of this action.

[5]Cappas was permitted to join Eddington's motion to suppress, and the judge entered an order as to Cappas, allowing suppression of the firearm and ammunition and denying suppression of the open bottles of beer.

Because we conclude that the impoundment was justified in the circumstances of this case, we reverse the allowance of the motion to suppress the firearm and ammunition.

1. *Background.* In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the evidentiary hearing.[6] See *Commonwealth* v. *Garcia*, 443 Mass. 824, 828 (2005).

On April 29, 2007, at approximately 4:15 A.M., two officers of the Springfield police department, David Martin and Matthew Vickery, undertook surveillance (in a marked police cruiser) of an "after-hours" party at a residence on the corner of Colonial Avenue and Wilbraham Road. The officers were familiar with the residence because it was the scene of regular parties that frequently involved criminal activities that required their response, including fighting, shootings, two murders, public drinking outside the residence, and illegal parking.

Shortly after arriving at the residence, the officers saw the defendants leave the party carrying what appeared to be bottles of beer. The defendants walked across Wilbraham Road and over to a parking lot adjacent to a church. They got into an automobile, taking their bottles with them, and drove out of the parking lot. They turned left on Wilbraham Road, and then turned left on Suffolk Street. The officers followed and signaled for them to stop by using their blue lights and siren. The automobile pulled over promptly and stopped alongside a curb on the side of the street.[7] This location was a short distance from the party the defendants had attended.

---

[6]We "supplement a judge's finding of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007). Here, the defendants do not dispute the judge's factual findings, and it is apparent from the record that the judge implicitly credited the testimony of Officers David Martin and Matthew Vickery, who provided the only testimony at the evidentiary hearing on the motion to suppress.

[7]It is undisputed that the automobile was lawfully parked.

The officers approached the automobile to investigate the possibility of the presence of open containers of alcoholic beverages. Their suspicions were confirmed as soon as Officer Martin looked inside the automobile while asking Eddington, who was driving, for his license and registration. Two opened bottles of beer were in plain view inside the cup holders on the console between the front seats.

Eddington told the officers that he did not have a license, and he did not have the automobile's registration. Officer Martin started preparing citations for the defendants for having open containers of beer in the automobile. He then obtained confirmation that Eddington's license had been suspended. Eddington was removed from the automobile and placed under arrest for operating a motor vehicle with a suspended license. The officers determined that neither Eddington nor Cappas owned the automobile. Rather, from a check of the automobile's registration plate number, the officers learned that the automobile was registered to a Jessica Rodriguez.

Because it was about 4:30 A.M., the officers decided not to contact Rodriguez to have her retrieve her automobile. The officers believed Suffolk Street (near Wilbraham Road) to be a "high crime" area, and were concerned that if left parked at the curb, the automobile would be vulnerable to theft or damage.[8] Consequently, they decided to impound the automobile and arranged for it to be towed. Cappas was ordered out of the automobile. An inventory search was performed pursuant to the written policy of the department, and a loaded revolver was recovered under the front passenger seat.[9] Cappas was arrested.

As relevant here, the judge suppressed the firearm and am-

---

[8]Officer Martin testified that they did not leave the automobile parked on the street because it was a "high-crime area and there [were] valuable items inside the motor vehicle." However, the inventory took place after the decision to impound, and, when making the decision to impound, the officers were unaware of the contents of the automobile's trunk. See note 9, infra. Officer Martin also explained that, "to protect the department, to protect the vehicle's owner, we towed the motor vehicle so no harm would come to it, that it wouldn't be subjected to being stolen or broken into and the items being stolen." Officer Martin added that the police generally "don't have the luxury of waiting around for a registered owner to come to the scene. It ties up an officer . . . ."

[9]Various items of stereo equipment, including a "speaker box" and an "amp," were found in the trunk of the automobile. There is no evidence that

munition, concluding that the officers' decision to impound the automobile was not justified. Because the automobile was lawfully parked, impoundment could only be justified if there was a risk of theft or threat of vandalism, which the judge determined that the Commonwealth did not show. Specifically, the judge explained that the officers' testimony that the vicinity of the stop was a "high crime" area was insufficient to establish a likelihood of theft or vandalism because "[t]he nature of the crimes" that rendered the location of the stop a high crime area was not described.[10]

The Appeals Court reversed, concluding that the case falls under "the long-standing rule that impoundment of a car pulled over may be justified by specific evidence of a danger that the car left unattended might be vandalized or stolen when that danger is combined with a need to protect the police from false claims of loss." *Commonwealth* v. *Eddington*, 76 Mass. App. Ct. 173, 177 (2010), citing *Commonwealth* v. *Ellerbe*, 430 Mass. 769, 775 (2000). The Appeals Court found the following factors determinative: the automobile was parked in a location dictated by the circumstances of the stop and not by the driver's choice; the location of the stop was a "high crime" area; the defendants were not able to move the automobile; the owner was not present; it was impracticable, on account of the time at which the stop occurred, to contact the owner; and the police were not constitutionally obligated to contact the owner. *Commonwealth* v.

---

the existence of this equipment was visible or made known to the officers prior to their decision to impound the automobile.

[10]In his decision, the judge, based on his "personal familiarity with the neighborhood" in which the stop occurred, took notice of certain facts not in the record concerning the nature of the neighborhood that undercut Officer Martin's testimony that it was a "high crime" area. We need not address the Commonwealth's argument that this action by the judge was improper because we do not, in this case, place any emphasis on the nature of the neighborhood where the stop occurred. There was an absence of specific facts explaining why this particular location where Rodriguez's automobile came to a stop was considered to be in a "high crime" area. See *Commonwealth* v. *Johnson*, 454 Mass. 159, 163 (2009) ("The term 'high crime area' is itself a general and conclusory term that should not be used to justify a stop or a frisk, or both, without requiring the articulation of specific facts demonstrating the reasonableness of the intrusion"). We caution that, to justify a decision to impound, the police need more than the circumstance of a vehicle being stopped, and its driver arrested, in a "high crime" area.

*Eddington, supra* at 177-178. The Appeals Court explained that these factors demonstrated "a sufficient risk that the car might be vandalized or stolen so that, when combined with the risk of false claims for loss against the police, the impoundment of the car, pursuant to a constitutionally adequate police policy, was reasonable and thus permissible under the Fourth Amendment." *Id.* at 178.

2. *Further appellate review.* In this case, Cappas's appellate counsel, unlike Eddington's appellate counsel, did not file an application for further appellate review. We have stated that, in civil cases involving multiple parties, "we will not consider the arguments of a wholly unsuccessful party who did not seek further appellate review." *Bradford* v. *Baystate Med. Ctr.,* 415 Mass. 202, 205 (1993). We noted that this principle "is consistent with our rule that one who does not appeal from a judgment is not entitled to more favorable treatment on appeal than that expressed in the judgment." *Id.* at 205 n.4. In addition, the principle serves to provide fair notice to the Commonwealth of what issues and what defendants will be before us. It also enables the clerk of the Appeals Court to satisfy the prescribed duties concerning the issuance of rescripts of the Appeals Court. See Mass. R. A. P. 23, as appearing in 367 Mass. 921 (1975) ("The timely filing . . . of an application for further appellate review will stay the rescript until disposition of the . . . application . . . . If the [application] is denied, the rescript shall issue forthwith unless the appellate court or a single justice orders otherwise. If an application for further appellate review is granted the rescript of the Appeals Court shall not issue to the lower court"). We thus adopt, on and after the date of this opinion, the rule set forth in *Bradford* v. *Baystate Med. Ctr., supra* at 205, to criminal cases, requiring each defendant in a multiple defendant case (whether consolidated or not) who seeks further appellate review to file a timely application. In view of our decision in this case, and the procedural posture below (the trial court was notified that an application for further appellate review was filed in connection with the Appeals Court case and it appears that no further proceedings in the trial court were conducted), Cappas will not be subject to the new rule. Rather, our decision will apply to both Eddington's and Cappas's cases.

3. *Propriety of the impoundment.* On a motion to suppress evidence seized during a warrantless search, such as an inventory search as was done here, it is the Commonwealth's burden to establish that the evidence was lawfully obtained. *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 57 (1974). "Under both the Federal and Massachusetts Constitutions, analysis of the legitimacy of an inventory search of an impounded vehicle involves two related, but distinct, inquiries: (1) whether the impoundment of the vehicle leading to the search meets constitutional strictures, and (2) whether the conduct and scope of the search itself meets those strictures."[11] *Commonwealth* v. *Ellerbe,* 430 Mass. 769, 772-773 (2000). The second aspect of the analysis is not at issue in this case; we focus on the propriety of the impoundment. See *Commonwealth* v. *Garcia,* 409 Mass. 675, 678 (1991) (concerning inventory search, "the propriety of the impoundment of the vehicle is a threshold issue in determining the lawfulness of the inventory search").

"The impoundment of a vehicle for noninvestigatory reasons is generally justified if supported by public safety concerns or by the danger of theft or vandalism to a vehicle left unattended." *Commonwealth* v. *Brinson,* 440 Mass. 609, 612 (2003), quoting *Commonwealth* v. *Daley,* 423 Mass. 747, 750 (1996). There have been other circumstances where impoundment has been justified, such as where a vehicle was stopped on private property and the only occupant of the vehicle was arrested, leaving it "driverless," *Commonwealth* v. *Dunn,* 34 Mass. App. Ct. 702, 706 (1993); and where the vehicle stopped did not possess valid registration plates, *Commonwealth* v. *Horton,* 63 Mass. App. Ct. 571, 573, 577 (2005). The decisions demonstrate that our determinations are fact driven, with the overriding concern being the guiding touchstone of "[r]easonableness." *Commonwealth* v. *Ellerbe, supra* at 776. It must also not be overlooked that there are three separate interests protected by permitting warrantless inventory searches: "the protection of the vehicle and its contents; the protection of the police and the tow company from false

---

[11]Under both the Federal and State Constitutions, inventory searches must be done in accordance with standard police operating procedures, and under art. 14, those standard procedures must be in writing. *Commonwealth* v. *Ellerbe,* 430 Mass. 769, 773 n.8 (2000), and cases cited. These requirements are not at issue in this case.

charges; and the protection of the public from the dangerous items which might be in the vehicle," which includes the interior of a locked trunk that is "certainly not invulnerable to vandalism or theft." *Commonwealth* v. *Garcia, supra* at 682.

In this case, the automobile was lawfully parked and did not pose a public safety risk. Relying on *Commonwealth* v. *Brinson, supra,* Eddington contends that, because the automobile was lawfully parked, the officers should have left it. We held that "the government may not impound and conduct an inventory search of a car based on the arrest of the owner, where the car was lawfully parked in a privately owned parking lot and there was no evidence that the car constituted a safety hazard or was at risk of theft or vandalism." *Id.* at 610. In the *Brinson* case, however, the owner of the automobile inventoried was present at the stop and earlier had selected the parking lot location at which his automobile was parked. *Id.* at 610-611. Here, the action of police in signaling for the automobile to pull over dictated the location of the stop (along the curb of a public street) and the owner of the automobile, Rodriguez, was not present at the scene to express a preference on the vehicle's disposition. In accordance with our past precedent, the police were not constitutionally obligated to contact her. See *Commonwealth* v. *Caceres,* 413 Mass. 749, 751-752 n.2 (1992) (we have said in dictum "if the *owner* of the vehicle is present and makes such a proposal [for an alternative disposition of the automobile], this principle [considering the alternate disposition] seems appropriate" [emphasis added]).[12] See also *Commonwealth* v. *Ellerbe, supra* at 776 ("Reasonableness did not require police officers to

---

[12]In *Commonwealth* v. *Caceres,* 413 Mass. 749, 751 n.1 (1992), we stated that "[i]t would seem reasonably clear that the failure to give a person an opportunity to make reasonable alternative arrangements for the vehicle would not invalidate an inventory search under Fourth Amendment principles." We noted that "some State courts have indicated that the police must respond to a reasonable request for an alternative disposition of the vehicle [and] [o]thers have placed the burden on the police to initiate consideration of obvious reasonable alternatives." *Id.,* citing 3 W.R. LaFave, Search and Seizure § 7.3(c) (2d ed. 1987). In our view, adopting any per se rule whether such a rule applies to an owner or a driver contravenes the proper constitutional analysis — the touchstone of reasonableness that itself necessitates a case-by-case analysis that takes into account the numerous and varied situations in which decisions to impound are made. See *Coolidge* v. *New Hampshire,* 403 U.S. 443, 509-510 (1971) (Black, J., concurring and dissenting) ("The relevant test [whether the

guard the vehicle or to wait with the unlicensed passenger until a licensed driver could be produced to take control of it"); *Commonwealth* v. *Henley*, 63 Mass. App. Ct. 1, 6 (2005) (police had no constitutional obligation to contact, in early morning hour, owner of vehicle, which was rental company, or authorized driver under rental agreement who was not present at stop). Although we need not examine the reason of the police officers for not attempting to contact Rodriguez, the reason for not doing so — the early morning hour — provided a sound basis for their decision. We also find significant the facts that Eddington was unable to operate the automobile because he had been placed under arrest (for operating a motor vehicle with a suspended license) and Cappas had been drinking and was not known to be authorized to drive the automobile. See *Coleman* v. *State*, 668 P.2d 1126, 1130 (Okla. Crim. App. 1983), cert. denied, 464 U.S. 1073 (1984) (impoundment justified where driver placed in custody and passenger had been observed drinking beer). Cf. *Commonwealth* v. *Ellerbe*, *supra* at 775-776 (impoundment justified in part based on fact that driver was arrested and passenger had no license with her); *Commonwealth* v. *Daley*, *supra* at 750 n.4 (impoundment justified in part because vehicle could not be turned over to third person). Nor was the vehicle's registration produced. See G. L. c. 90, § 11 ("Every person operating a motor vehicle shall have the certificate of registration for the vehicle . . . and his license to operate, upon his person or in the vehicle, in some easily accessible place . . ."). Cf. *Commonwealth* v. *Daley*, *supra* at 750 (impoundment justified in part because vehicle was unregistered, uninsured, and had attached plates belonging to another vehicle). All these reasons, together with the interests protected by conducting an inventory search[13] as well as the "the proposition that an officer's judgment in the matter is to be tested by what

Fourth Amendment has been violated] is not the reasonableness of the opportunity to procure a warrant, but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by per se rules; each case must decided on its own facts"). See also *Landry* v. *Attorney Gen.*, 429 Mass. 336, 348 (1999), and cases cited (Fourth Amendment violations occur only if search or seizure is unreasonable).

[13]Because Rodriguez was not present at the stop, the police were not made aware of the existence of any valuables in the various compartments of the automobile, such as the trunk, that might be at risk of theft and thereby war-

reasonably appeared to him at the time, rather than to us in long afterthought," *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 415 (1996), support impoundment.[14] We thus conclude that the police acted reasonably in deciding to impound the automobile in the circumstances.

4. *Conclusion.* The orders allowing the motion to suppress as to Eddington and Cappas are reversed, and orders denying the motion to suppress are to enter. The cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

GANTS, J. (concurring). I agree with the court that, under our controlling case law, the impoundment of the vehicle in this case was reasonable because the owner was not a driver or passenger in the vehicle, the driver could not produce the vehicle's registration, and it was not clear that the driver had the owner's authorization. Therefore, even though public safety was not at risk by leaving the vehicle locked on the public street where it was lawfully parked at the time of the stop, and even though there was no reason to believe that the vehicle contained dangerous or expensive personal property, and even though the vehicle was not parked in a high crime area where there was an escalated risk of theft or vandalism, it was still reasonable to impound the vehicle because there was no one present at the scene who plainly had authority over the vehicle to propose to the police a reasonable alternative to impoundment. Because impoundment was reasonable, an inventory search conducted in accordance with written police procedures was permissible to protect the police and tow company from false claims of theft or property damage. I write separately for two reasons.

ranted safeguarding. While the police could not justify the impoundment by the presence of valuable property that they did not discover until after the inventory search had been conducted, it was not unreasonable for the police to consider the possibility that there might be valuables present inside the vehicle as a relevant factor in deciding to impound.

[14]We underscore, in response to the concern expressed in Justice Gants's concurring opinion, that we do not base our conclusion solely on the fact that the owner of the vehicle was not present at the time of the stop.

First, in *Commonwealth* v. *Wilson*, 389 Mass. 115, 117 (1983), we declared that inventory searches are reasonable "where they are conducted in accord with standard procedures and are not a pretext, because they protect the defendant's property and ensure the police against later claims of theft or lost property." With respect to motor vehicles, the standard written procedures we have required for inventory searches focus solely on the conduct of the search of the motor vehicle, not on whether the motor vehicle itself should be impounded and made the subject of an inventory search. See *Commonwealth* v. *Daley*, 423 Mass. 747, 749-751 (1996). If we wish effectively to prevent motor vehicle inventory searches that are purely pretext, that is, searches that are conducted not because the police wish to protect the defendant's property but because the police wish, for investigative purposes, to search the motor vehicle and lack the probable cause needed lawfully to do so, it is necessary to require the police to comply with standard written procedures as to whether to conduct an inventory search, not merely as to how such an inventory search should be conducted.

The standard written procedures need not be complex or difficult. They need only, for instance, provide that where the police are considering impoundment of a motor vehicle whose driver is its owner or a person clearly authorized by the owner to drive the vehicle, the police must (1) inform the driver that the vehicle will be taken to a police facility or private storage facility for safekeeping unless the driver directs the officer to dispose of it in some lawful manner, and (2) comply with an alternative disposition if that alternative is reasonable. The written procedures need not address which alternative dispositions are reasonable in the various circumstances; that is best left to the governing case law.

This procedural standard is derived from, but narrower than, the standard for noninvestigatory vehicle impoundment proposed by perhaps the best known scholar regarding the law of search and seizure, Wayne R. LaFave, in his treatise on the Fourth Amendment to the United States Constitution. See 3 W.R. LaFave, Search and Seizure § 7.3(c), at 621 (4th ed. 2004).[1] See also LaFave, Controlling Discretion by Administrative

---

[1] Professor LaFave proposes that the "arrested operator" should be asked to

Regulations: The Use, Misuse, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication, 89 Mich. L. Rev. 442, 446 & n.31 (1990).

A similar standard is set forth in Rule 603 of the Model Rules for Law Enforcement, Searches, Seizures and Inventories of Motor Vehicles at 63 (1974) (Model Rules), prepared by the Project on Law Enforcement Policy and Rulemaking, which provides that "[w]hen a person is arrested in or around a vehicle which he owns or has been authorized to use, . . . [he] shall be advised that his vehicle will be taken to a police facility or private storage facility for safekeeping unless he directs the officer to dispose of it in some other lawful manner."[2] The Model Rules were approved by the project advisory board, which consisted of representatives from police departments in several large United States cities; Dade County, Florida; and the District of Columbia.

While "we have not addressed whether the State Constitution imposes an obligation on the police to consider practical alternatives to impoundment before an inventory search can be reasonable," *Commonwealth* v. *Daley, supra* at 750, courts in other States consider whether a driver proposed a reasonable alternative disposition in determining the reasonableness of a vehicle impoundment. See, e.g., *State* v. *Gauster,* 752 N.W.2d 496, 508 (Minn. 2008) (police should permit driver to make reasonable alternative arrangements where he makes specific request to do so); *State* v. *Lunsford,* 655 S.W.2d 921, 924 (Tenn. 1983) (based on circumstances, police should permit driver's reasonable alternative to impoundment); *State* v. *Lizee,* 173 Vt. 473, 475 (2001) ("In determining whether impoundment was necessary, courts have focused on whether reasonable alternatives were available, such as whether . . . the driver could make alternative

propose an alternative disposition of the vehicle, whereas I propose that the arrested operator be asked only if he is the owner or clearly has the owner's authorization. See 3 W.R. LaFave, Search and Seizure § 7.3(c), at 621 (4th ed. 2004). I do not suggest that we impose a duty on the police to investigate the question of authorization where this is unclear.

[2] "In any case where [the arrestee] *requests that his vehicle be lawfully* parked on a public street, he shall be required to make his request in writing." Rule 603(B) of the Model Rules for Law Enforcement, Searches, Seizures and Inventories of Motor Vehicles at 63 (1974), prepared by the Project on Law Enforcement Policy and Rulemaking.

arrangements . . ."); *State* v. *Perry*, 174 W. Va. 212, 217 (1984), and cases cited ("Courts have held that a driver must be given a reasonable opportunity to make some alternative disposition of the vehicle before the police may impound it for the sole purpose of protecting it and its contents from theft or damage").

Second, I fear that the court's opinion may be misunderstood to mean that impoundment of a vehicle is reasonable, regardless of the circumstances, if the owner of the vehicle is not present in the vehicle at the time of arrest. Under the facts of this case, based on the information known or easily ascertainable by the police at the time of impoundment, no one in the vehicle was the owner or clearly authorized by the owner to drive the vehicle. We have yet to hold that only the owner of the vehicle may propose an alternative disposition to impoundment, and I do not believe we do so here. In dictum in a footnote in *Commonwealth* v. *Caceres*, 413 Mass. 749 (1992), we said that LaFave's suggestion that, "if the driver asks that his car be turned over to a passenger, this should be done if the passenger is not under arrest or otherwise incapacitated and displays a valid operator's license," "seems appropriate" if the owner of the vehicle is present. *Id.* at 751-752 n.2, quoting 3 W.R. LaFave, Search and Seizure § 7.3(c), at 92 (2d ed. 1987). We did not discuss there whether a driver who is clearly authorized by the owner to drive the vehicle (and park it) may propose a reasonable alternative disposition.